John J. Nelson (SBN 317598)
**MILBERG, PLLC**
280 S. Beverly Drive, Penthouse
Beverly Hills, California 90212
Telephone: (858) 209-6941
E: jnelson@milberg.com

*Attorneys for Plaintiffs and Proposed Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| JENNIFER COLLIER, DANA GOODSON, JOSHUA WOOD, AMBER JENKINS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>CETERA FINANCIAL GROUP, INC.,<br><br>Defendant | Case No.: 2:26-cv-03376-SPG-KES<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jennifer Collier, Dana Goodson, Joshua Wood, and Amber Jenkins ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Consolidated Class Action Complaint against Defendant Cetera Financial Group, Inc. ("Defendant") based on personal knowledge and the investigation of counsel, and allege as follows:

## INTRODUCTION

1. With this action, Plaintiffs seek to hold Defendant responsible for the harms it caused Plaintiffs and similarly situated persons in the preventable breach of Defendant's inadequately protected computer network resulting in the disclosure

of its customers' sensitive personally identifiable information ("PII" or "Private Information").

2. Defendant is an independent financial services provider and wealth management network in the United States, supporting over 11,000 financial advisors and managing over $640 billion in assets.[1]

3. As part of its business, and in order to maximize its profits, Defendant obtained and stored the Private Information of Plaintiffs and Class Members.

4. Plaintiffs' and Class Members' sensitive and confidential Private Information—which they entrusted to Defendant on the mutual understanding that Defendant would protect it against disclosure—was targeted, compromised and unlawfully accessed due to the Data Breach.

5. By taking possession and control of Plaintiffs' and Class Members' Private Information, Defendant assumed a duty to securely store and protect it.

6. Defendant breached this duty and betrayed the trust of Plaintiffs and Class Members by failing to properly safeguard and protect their Private Information, thus enabling cybercriminals to access, acquire, appropriate, compromise, disclose, encumber, exfiltrate, release, steal, misuse, and/or view it.

7. Defendant became aware of suspicious activity involving a single employee email account and launched an investigation, which determined that an unauthorized person gained access to the email account between July 7, 2025, and August 21, 2025—a period of approximately forty-five days.[2] On or around January 30, 2026, Defendant determined that certain PII was involved in the incident.[3] Defendant did not begin notifying affected individuals until March 25, 2026—

---

[1] Cetera Financial Group, About Us, https://cetera.com (last visited Apr. 15, 2026).
[2] Cetera Financial Group, Data Breach Notice to N.H. Att'y Gen. (Mar. 24, 2026).
[3] Id.

approximately eight months after the unauthorized access began and nearly five months after Defendant discovered the PII was compromised.[4]

8. This was not Defendant's first data security failure. In August 2021, the United States Securities and Exchange Commission ("SEC") sanctioned five Defendant entities for failures in their cybersecurity policies and procedures that resulted in the takeover of over sixty employee email accounts between November 2017 and June 2020, exposing the PII of at least 4,388 customers and clients.[5] The SEC found that none of the compromised accounts had been protected with multi-factor authentication, despite Defendant's own policies requiring it.[6] Defendant was censured and ordered to pay a $300,000 penalty.[7]

9. Despite this prior regulatory enforcement—which put Defendant on express notice that its employee email security was deficient and that its systems were vulnerable to account takeover attacks—Defendant failed to implement adequate safeguards to prevent the substantially similar 2025 Data Breach at issue here.

10. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect consumers' and employees' PII from a foreseeable and preventable cyber-attack. Defendant could have prevented or mitigated the consequences of the Data Breach by limiting access to sensitive information to only

---

[4] *Id.*

[5] *In re Cetera Advisor Networks LLC,* Exchange Act Release No. 34-92800, File No. 3-20490 (Aug. 30, 2021).

[6] *Id.* at 3.

[7] Press Release, U.S. Sec. & Exch. Comm'n, SEC Announces Three Actions Charging Deficient Cybersecurity Procedures, Release No. 2021-169 (Aug. 30, 2021).

necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring its systems for signs of unusual activity, and regularly rotating passwords.

11. Moreover, upon information and belief, Defendant was targeted for a cyber-attack due to its status as a financial services company that collects and maintains highly valuable PII—including Social Security numbers, financial account information, and payment card data—on its systems.

12. Upon information and belief, the PII compromised in the Data Breach was targeted and exfiltrated by cyber-criminals and remains in the hands of those cyber-criminals who target PII for its value to identity thieves.

13. Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, and/or negligently failing to take and implement adequate and reasonable measures to ensure that the Private Information of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the Plaintiffs' and Class Members' Private Information was compromised through disclosure to an unknown and unauthorized criminal third party.

14. As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft and will incur out-of-pocket costs for purchasing credit monitoring services, credit freezes, credit reports, and other protective measures.

15. Plaintiffs and the Class Members are victims of Defendant's

negligence and inadequate cyber security measures. Specifically, Plaintiffs and members of the proposed Class trusted Defendant with their Private Information, but Defendant betrayed that trust. Defendant failed to properly use reasonable industry standard security practices to prevent the Data Breach.

16. Plaintiffs bring this class action lawsuit on behalf all those similarly situated to address Defendant's inadequate safeguarding of Class Members' PII that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

17. The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the Private Information of Plaintiffs and the Class was exactly that—private. No longer. Now, their Private Information is permanently exposed and unsecure.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and members of the proposed Class are citizens of states different from Defendant.

19. This Court has jurisdiction over Defendant through its business operations in this District, the specific nature of which occurs in this District. Defendant's principal place of business is in this District. Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)

because Defendant's principal place of business is located in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## PARTIES

21. Plaintiff Jennifer Collier is a resident and citizen of Santee, California.

22. Plaintiff Dana Goodson is a resident and citizen of West Hollywood, California.

23. Plaintiff Joshua Wood is a resident and citizen of Denver, Colorado.

24. Plaintiff Amber Jenkins is a resident and citizen of Wood River, Illinois.

25. Defendant is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2301 Rosecrans Avenue, Suite 5100, El Segundo, California 90245. Defendant conducts business throughout the United States, including in this District.

## FACTUAL ALLEGATIONS

***Defendant's Business***

26. Defendant is an independent financial services provider and wealth management network in the United States, supporting over 12,000 financial advisors and managing over $640 billion in assets.

27. Defendant operates a network of wholly-owned subsidiary broker-dealers and registered investment advisers, all of which are members of FINRA/SIPC or registered with the SEC. Defendant, as corporate parent, provides centralized business services to its subsidiary entities, including cybersecurity. (*See In re Cetera Advisor Networks LLC*, Exchange Act Release No. 34-92800 at 2.)

28. In the course of their relationship, Plaintiffs and Class Members provided Defendant with their sensitive Private Information, including names,

Social Security numbers, dates of birth, driver's license numbers, financial account numbers, and payment card information.

29. Upon information and belief, in the course of collecting PII from Plaintiffs and Class Members, Defendant promised to provide confidentiality and adequate security for the data it collected from individuals through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

30. Defendant understood the need to protect Private Information and prioritize its data security. However, Defendant failed to meet its obligations.

31. Despite recognizing its duty to do so, on information and belief, Defendant has not implemented reasonable cybersecurity safeguards or policies to protect Private Information in its possession or adequately trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, Defendant leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to Plaintiffs' and Class Members' Private Information.

***The Data Breach***

32. On information and belief, Defendant collects and maintains former and current clients' unencrypted Private Information in its computer systems. In collecting and maintaining the Private Information, Defendant implicitly agreed it would safeguard the data using reasonable means according to its internal policies and federal and state law.

33. According to the Breach Notice, Defendant claims that it became aware of suspicious activity involving a single employee email account and immediately began an investigation.[8]

---

[8] Cetera Financial Group, *supra* note 2.

34. Following an investigation, Defendant determined that an unauthorized person gained access to the email account between July 7, 2025, and August 21, 2025.[9] Defendant then took steps to identify any impacted data.[10]

35. On or around January 30, 2026, Defendant's ongoing review determined that certain Private Information may have been compromised.[11] The following types of Private Information were compromised in the Data Breach: name, Social Security number, driver's license number and financial account information.

36. In other words, the Data Breach investigation revealed Defendant's cyber and data security systems were completely inadequate and allowed cybercriminals to access files containing a treasure trove of highly private information.

37. Through its inadequate security practices, Defendant exposed Plaintiffs' and the Class's Private Information for theft and sale on the dark web.

38. On or around March 25, 2026, Defendant began sending letters to affected individuals notifying them of the Data Breach.[12] Thus, approximately eight months elapsed between when the unauthorized access began and when affected individuals received notice.

39. Thus, Defendant kept Plaintiffs and the Class in the dark—thereby depriving Plaintiffs and the Class of the opportunity to try and mitigate their injuries in a timely manner.

---

[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *See* Data Breach Notification Letter, available at https://ago.vermont.gov/sites/ago/files/documents/2026-03-25%20Cetera%20Financial%20Group%20-%20Data%20Breach%20Notice%20to%20Consumers.pdf

40. When Defendant notified Plaintiffs and the Class of the Data Breach, Defendant acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, encouraging Plaintiffs and the Class to:

a. "remain vigilant against incidents of identity theft and fraud;"

b. "review[] your account statements;"

c. "monitor[] your free credit reports for suspicious activity and to detect errors."[13]

41. Despite its duties and alleged commitments to safeguard PII, Defendant did not in fact follow industry standard practices or comply with federal and state law in securing Plaintiffs' and Class Members' Private Information, as evidenced by the Data Breach.

42. On information and belief, Defendant failed to adequately train and supervise its IT and data security agents and employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over Plaintiffs' and Class Members' Private Information. Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the Private Information.

43. For example, as evidenced by the Data Breach's occurrence, the infiltrated network was not protected by sufficient multi-layer data security technologies or effective firewalls.

44. Plaintiffs and Class Members entrusted Defendant with their Private Information which includes information (such as Social Security numbers) that is static, does not change, and can be used to commit a myriad of financial crimes.

45. Even with several months of credit monitoring services, the risk of

[13] *Id.*

identity theft and unauthorized use of Plaintiffs' and Class Members' Private Information is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

46. Cybercriminals do not need to have harvested every piece of an individual's PII in order to commit identity fraud or misuse Plaintiffs' and the Class's Private Information. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff's and the Class's financial accounts.

47. As the Harvard Business Review notes, such "[c]ybercriminals frequently use the dark web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[14]

48. On information and belief, Plaintiffs' and the Class Members' stolen Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

49. Defendant had obligations created by the Gramm-Leach-Bliley Act ("GLBA"), the Federal Trade Commission Act ("FTC Act"), contract, common law, and industry standards to keep Plaintiff's and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

50. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for

---

[14] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

51. Moreover, Defendant could have prevented or mitigated the consequences of the Data Breach by limiting access to sensitive information to only necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring its systems for signs of unusual activity or the transfer of large volumes of data, and regularly rotating passwords.

52. As a result of Defendant's failures, the attacker targeted, accessed, and acquired files containing unencrypted PII of Plaintiff and Class Members. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

***Defendant's History of Cybersecurity Failures***

53. The 2025 Data Breach was not Defendant's first email-based security incident. Between November 2017 and June 2020, cloud-based email accounts of over sixty Defendant personnel were taken over by unauthorized third parties, resulting in the exposure of PII of at least 4,388 customers and clients.[15]

54. On August 30, 2021, the SEC sanctioned five Defendant entities—Cetera Advisor Networks LLC, Cetera Investment Services LLC, Cetera Financial Specialists LLC, Cetera Advisors LLC, and Cetera Investment Advisers LLC—for failures in their cybersecurity policies and procedures.[16] The SEC's order found that the Defendant entities violated Rule 30(a) of Regulation S-P, also known as the Safeguards Rule, which is designed to protect confidential customer information.[17]

---

[15] *In re Cetera Advisor Networks LLC*, supra note 5.
[16] *Id.*
[17] *Id.* at 2.

55. The SEC found that Defendant's policies and procedures to protect customer information and to prevent and respond to cybersecurity incidents were not reasonably designed to meet their objectives.[18] Critically, none of the compromised email accounts had multi-factor authentication enabled, even though Defendant's own internal policies had required MFA "wherever possible" since 2018.[19]

56. The SEC further found that Cetera Advisors LLC and Cetera Investment Advisers LLC sent misleading breach notification letters to clients that included language suggesting the notifications were issued much sooner than they actually were after discovery of the incidents.[20]

57. Defendant was censured and ordered to pay a $300,000 civil penalty.[21] The 2021 SEC enforcement action put Defendant on express regulatory notice that: (a) its employee email accounts were vulnerable to takeover attacks; (b) its cybersecurity policies and procedures were inadequate; (c) its MFA implementation was deficient; and (d) its breach notification practices were misleading.

58. Despite this prior enforcement and express notice, the 2025 Data Breach involved the same type of compromise—unauthorized access to an employee email account—demonstrating that Defendant failed to remediate the known deficiencies identified by the SEC.

***Defendant's Data Breach was Preventable***

---

[18] *Id.* at 3–4.
[19] *Id.* at 3.
[20] *Id.*
[21] Press Release, U.S. Sec. & Exch. Comm'n, *supra* note 7.

59. Data breaches are preventable.[22] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." [23] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[24]

60. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[25]

61. Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some of the biggest cybersecurity breaches: Target,[26]

---

[22] Lucy L. Thompson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012) (last accessed Feb. 3, 2025).

[23] *Id.* at 17.

[24] *Id.* at 28.

[25] *Id.*

[26] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/.

Yahoo,[27] Marriott International,[28] Chipotle, Chili's, Arby's,[29] and others.[30]

62. In the years immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks because warnings were readily available and accessible via the internet.

63. Most importantly, Defendant's own history made this Data Breach uniquely foreseeable. The SEC's 2021 enforcement action found that Defendant had suffered employee email account takeovers for over three years, and that Defendant's cybersecurity policies were inadequate.[31] That prior enforcement put Defendant on actual notice that employee email accounts were a known attack vector and that its defenses were insufficient.

64. Despite this notice, the 2025 Data Breach involved the same type of attack exploiting the same type of vulnerability. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's regulatory history and the known high frequency

---

[27] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html.

[28] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/.

[29] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b.

[30] *See, e.g.*, Taylor Armerding, *The 18 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Dec. 20, 2018), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html.

[31] *In re Cetera Advisor Networks LLC*, *supra* note 5.

of cyberattacks in the financial industry.

65. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

66. In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[32]

67. In 2022, the Identity Theft Resource Center's Annual End-of-Year Data Breach Report listed 1,802 total compromises involving 422,143,312 victims for 2022, which was just 50 compromises short of the current record set in 2021.[33]

68. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. Of the 3,205 recorded data compromises, 809 of them, or 25.2% were in the medical or healthcare industry. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points. The 2023 compromises represent a 78-percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

---

[32] *See* 2021 Data Breach Annual Report, ITRC 6 (Jan. 2022), available at https://www.idtheftcenter.org/notified (last accessed Feb. 3, 2025).

[33] *2022 End of Year Data Breach Report*, Identity Theft Resource Center (Jan. 25, 2023), available at: https://www.idtheftcenter.org/publication/2022-data-breach-report/?utm_source=press+release&utm_medium=web&utm_campaign=2022+Data+Breach+Report.

69. 2024 was even worse for data breaches. While the total number of compromises fell 44 events short of the 2023 all-time high, the number of total victims increased to a staggering 1,350,835,988 victims, a 211% increase year over year.[34] Notably, 737 compromises in 2024 occurred in the Financial Services sector, making companies like Defendant the most common industry for data compromises.[35]

70. This trend has not slowed. The United States saw a new record of 3,322 data compromises in 2025, a massive 79 percent (79%) jump over five years.[36]

71. In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[37]

72. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse

---

[34] *ITRC 2024 Annual Data Breach Report*, IDENTITY THEFT RES. CTR. (Jan. 28, 2025), https://www.idtheftcenter.org/publication/2024-data-breach-report/.

[35] *Id.*

[36] *2025 End of Year Data Breach Report*, Identity Theft Resource Center (Jan. 2026), available at: https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf

[37] ZDNet, Ransomware mentioned in 1,000+ SEC filings over the past year (Apr. 30, 2020) (emphasis added), available at https://www.zdnet.com/article/ransomware-mentioned-in-1000- sec-filings-over-the-past-year/ (last accessed Feb. 3, 2025).

to pay and publicly naming and shaming victims as secondary forms of extortion."[38]

73. This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that: (i) cybercriminals were targeting entities such as Defendant that stored large volumes of PII, (ii) cybercriminals were ferociously aggressive in their pursuit of companies in possession of significant sensitive information such as Defendant, (iii) cybercriminals were leaking corporate information on dark web portals, and (iv) cybercriminals' tactics included threatening to release stolen data.

74. Prior to the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' Private Information could be accessed, exfiltrated, and published as the result of a cyberattack.

75. Defendant should certainly have been aware, and indeed was aware, that it was at risk for a data breach that could expose the Private Information that it collected and maintained.

76. Defendant was also on notice of the importance of data encryption of Private Information. Defendant knew it kept Private Information in its systems and yet it appears Defendant did not encrypt these systems or the information contained within them.

***Defendant Failed to Comply with Federal Trade Commission Guidelines***

77. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

---

[38] U.S. CISA, Ransomware Guide – September 2020, available at https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf (last accessed Feb. 3, 2025).

78. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."39 The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[40]

79. In 2016, the FTC updated its publication, Protecting Private Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of Private Information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[41]

80. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[42]

81. The FTC further recommends that companies not maintain Private

---

[39] 17 C.F.R. § 248.201 (2013).
[40] *Id.*
[41] *Protecting Private Information: A Guide for Business*, FEDERAL TRADE COMMISSION (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[42] *Id.*

Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

82. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

83. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

84. Defendant failed to properly implement these basic data security practices.

85. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Customers' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

86. Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of Consumers; Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the

nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

***Defendant Owed Plaintiffs and Class Members a Duty Under Industry Standards and Applicable Law to Safeguard their Private Information***

87. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, viewed and misused by unauthorized persons. Defendant owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

88. Defendant owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

89. Several best practices have been identified that at a minimum should be implemented by large financial entities like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

90. Other best cybersecurity practices that are considered industry-standard include: installing appropriate malware detection software; monitoring and

limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

91. Defendant failed to meet the minimum standards of any of the following frameworks: NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

92. These foregoing frameworks exist as applicable industry standards, particularly for large financial entities. Defendant, however, failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

93. The mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take necessary steps to secure Plaintiffs' and Class Members' Private Information from those risks left that information in a dangerous condition.

94. Defendant disregarded the rights of Plaintiffs and Class Members by, inter alia: (i) recklessly and/or negligently failing to take adequate and reasonable measures to ensure that its business email accounts were protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiffs' and Class Members' Private Information; (iii) failing to take standard and

reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

95. Defendant owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

96. Defendant owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

97. Defendant owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

98. Defendant owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

***Defendant Acquired, Collected, and Stored the Private Information of Plaintiffs and Class Members.***

99. As a condition of receiving Defendant's services or employment, Plaintiffs and Class Members were required to give their sensitive and confidential Private Information to Defendant.

100. Defendant retains and stores this information and derives a substantial economic benefit from the Private Information that it collects. But for the collection of Plaintiffs' and Class Members' Private Information, Defendant would be unable to perform its services.

101. By obtaining, collecting, and storing the Private Information of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the Private Information from disclosure.

102. Plaintiffs and Class Members have taken reasonable steps to maintain

the confidentiality of their Private Information and relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

103. Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiffs and Class Members.

104. Further, Defendant could have mitigated the risk posed to Plaintiffs and the Class by deleting Private Information when it was no longer required for operational purposes.

105. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against cyberattacks and it is critical to take precautions for protection."[43]

106. Upon information and belief, Defendant made promises and representations to its customers to maintain and protect the Private Information of Consumers, demonstrating an understanding of the importance of securing Private Information. Plaintiffs and Class Members would not have provided their Private Information absent these representations.

107. Defendant's negligence in safeguarding the Private Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

108. To prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendant could and should have implemented, as

---

[43] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Oct. 18, 2024).

recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of cyberattack and how they occur.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common cyberattack locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the

AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Execute operating system environments or specific programs in a virtualized environment.
- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[44]

109. To prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

[44] *Id.* at 3-4.

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[45]

110. Given that Defendant was storing the Private Information of thousands of individuals, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

111. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of Plaintiffs and Class Members.

112. Defendant could have prevented this Data Breach by properly securing and encrypting the folders, files, and or data fields containing the Private Information of Plaintiffs and Class Members. Alternatively, Defendant could have

---

[45] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Oct. 18, 2024).

destroyed the data it no longer had a reasonable need to maintain or only stored data in an internet-accessible environment when there was a reasonable need to do so.

113. Defendant's negligence in safeguarding the Private Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

114. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

115. Defendant disregarded the rights of Plaintiffs and Class Members by recklessly and/or negligently failing to take and implement adequate and reasonable measures (including ones that it recommended other businesses take) to ensure that the Private Information of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, Plaintiffs' and Class Members' Private Information was compromised through disclosure to an unknown and unauthorized criminal third party.

116. Upon information and belief, Defendant breached its duties and obligations in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiffs and Class Members of Defendant's inadequate data security practices; (6) failing to encrypt or adequately encrypt the Private Information; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the

harm; (8) failing to utilize widely available software able to detect and prevent this type of attack; and (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

117. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiffs and Class Members are long-lasting and severe. Once Private Information is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

***Value of PII***

118. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[46] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[47] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[48]

119. Based on the foregoing, the information compromised in the Data

---

[46] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 18, 2024).

[47] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 18, 2024).

[48] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Oct. 18, 2024).

Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

120. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[49]

121. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

122. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

123. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Classes are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

124. Defendant was, or should have been, fully aware of the unique type

[49] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Oct. 18, 2024).

and the significant volume of data contained in Defendant's computer systems, amounting to potentially tens of thousands of individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

125. To date, Defendant has offered Plaintiffs and Class Members one year of online credit monitoring and identity protection services. The offered service is inadequate to protect Plaintiffs and Class Members from the threats they face for years to come, particularly in light of the Private Information at issue here.

126. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

***The Data Breach Increases Plaintiffs' and Class Members' Risk of Identity Theft***

127. Upon information and belief, the unencrypted Private Information of Plaintiffs and Class Members has already been made publicly available on the dark web.

128. Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members.

129. Simply put, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members because of the Data Breach.

130. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

131. Due to the risk of one's Social Security number being exposed, state legislatures have passed laws in recognition of the risk: "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes[.]"[50]

132. Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit off their misfortune.

133. Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective patients."[51]

134. "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a patient's identity after the initial account setup[.]"[52] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social

---

[50] *See* N.C. Gen. Stat. § 132-1.10(1)

[51] *See* https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-securitynumbers

[52] *See* https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibituse-of-social-security-numbers/

Security number may be enough to help a thief steal money from your bank account."[53]

135. Each year, identity theft causes billions of dollars of losses to victims in the United States.[54] For example, with the Private Information stolen in the Data Breach, identity thieves can open financial accounts, apply for credit, collect government benefits, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[55] These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and Class Members.

136. Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.[56] This stolen Private Information is then routinely traded on dark web black markets as a simple commodity.[57]

137. This is particularly true, as is the case in the Data Breach here, when cybercriminals are able to access an individual's Social Security number. A

---

[53] *See* https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-securitynumber-108597/

[54] *Facts + Statistics: Identity Theft and Cybercrime*, Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime.

[55] John Egan, *What Should I Do if My Driver's License Number is Stolen*, Experian (June 13, 2024), https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/.

[56] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/products/gao-07-737.

[57] Edvardas Mikalauskas, *What is your identity worth on the dark web?* Cybernews (September 28, 2021), https://cybernews.com/security/whats-your-identity-worth-on-dark-web/.

compromised Social Security number can give criminals and other unsavory groups the ability to fraudulently take out loans under the victims' name, open new lines of credit, and cause other serious financial difficulties for victims:

> [a] dishonest person who has your Social Security number can use it to get other Private Information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[58]

138. Driver's license numbers, which were compromised in the Data Breach, are incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information."[59]

139. A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200."[60]

140. According to national credit bureau Experian:

---

[58] United States Social Security Administration, *Identity Theft and Your Social Security Number*, United States Social Security Administration (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[59] *Hackers Stole Consumers' License Numbers From Geico In Months-Long Breach*, Forbes, Apr. 20, 2021, *available at:* https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-consumers-license-numbers-from-geico-in-months-long-breach/?sh=3bda585e8658 (last visited July 31, 2023).

[60] https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-consumers-license-numbers-from-geico-in-months-long-breach/?sh=3e4755c38658 (last visited on Feb. 21, 2023)

> A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.

141. According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[61] However, this is not the case. As cybersecurity experts point out:

> "It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks."[62]

142. Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[63]

143. According to data security experts, one out of every four data breach

---

[61] https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-consumers-to-watch-out-for-fraudulent-unemployment-claims/ (last visited on Feb. 21, 2023).

[62] *Id.*

[63] *How Identity Thieves Took My Wife for a Ride,* NY Times, April 27, 2021, available at: https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last visited on Feb. 21, 2023).

notification recipients become a victim of identity fraud.[64]

144. Furthermore, the Private Information has a long shelf life because it contains different types of PII, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

145. There is also a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that has not yet been exploited by cybercriminals presents a concrete risk that the cybercriminals who now possess Class Members' Private Information will do so at a later date or resell it.

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

146. As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

147. Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

148. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and resecuring their own computer systems.

---

[64] *Press Release,* Javelin Strategy & Research (Feb. 20, 2013), https://javelinstrategy.com/press-release/more-12-million-identity-fraud-victims-2012-according-latest-javelin-strategy-research.

149. Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[65]

150. Plaintiffs' mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[66]

151. Due to the nonfungible nature of the information compromised in this Breach (name and Social Security number), limited scope credit monitoring of the type offered by the Defendant is a woefully inadequate solution to the imminent and ongoing threat of identity theft faced by Plaintiffs and the Class.

***Cyber Criminals Will Use Plaintiffs' and Class Members' Private Information to Defraud Them or to Sell on the Dark Web***

152. This was a financially motivated Data Breach, as apparent from the discovery of the cyber criminals seeking to profit off the sale of Plaintiffs' and the Class Members' Private Information on the dark web. The Private Information exposed in this Data Breach is valuable to identity thieves for use in the kinds of criminal activity described herein. In fact, Plaintiffs have already suffered a

---

[65] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[66] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (.

significant amount of financial fraud.

153. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to personally identifiable information, they will use it.[67]

154. Hackers may not use the accessed information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

155. [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[68]

156. As described above, identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit.[69]

157. With this Data Breach, identity thieves have already started to prey on the victims, including Plaintiffs, and one can reasonably anticipate this will continue.

158. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false

---

[67] Ari Lazarus, *How fast will identity thieves use stolen info?*, FED. TRADE COMM'N (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info (last accessed Feb. 3, 2025).

[68] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/products/gao-07-737 (last accessed Feb. 3, 2025).

[69] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf (last accessed Feb. 3, 2025).

information to police.

159. One such example of criminals using Private Information for profit is the development of "Fullz" packages.[70]

160. Cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

161. The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and

---

[70] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texaslife-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-undergroundstolen-from-texas-life-insurance-finn/

sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

162. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and the Class's stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

163. Victims of the Data Breach, like Plaintiffs and other Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their credit because of the Data Breach.[71]

164. In fact, as a direct and proximate result of the Data Breach, Plaintiffs and the Class have suffered, and have been placed at an imminent, immediate, and continuing increased risk of suffering, harm from fraud and identity theft. Plaintiffs and the Class must now take the time and effort and spend the money to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and other personal accounts for unauthorized activity for years to come.

165. Plaintiffs and the Class have suffered, and continue to suffer, actual harms for which they are entitled to compensation, including:

a. Trespass, damage to, and theft of their personal property, including Private Information;

---

[71] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

b. Improper disclosure of their Private Information;

c. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals and having been already misused;

d. The imminent and certainly impending risk of having their Private Information used against them by spam callers to defraud them;

e. Damages flowing from Defendant's untimely and inadequate notification of the Data Breach;

f. Loss of privacy suffered as a result of the Data Breach;

g. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

h. Ascertainable losses in the form of deprivation of the value of individuals' Private Information for which there is a well-established and quantifiable national and international market;

i. The loss of use of and access to their credit, accounts, and/or funds;

j. Damage to their credit due to fraudulent use of their Private Information; and

k. Increased cost of borrowing, insurance, deposits and other items which are adversely affected by a reduced credit score.

166. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which remains in the possession of Defendant, is protected from further breaches by the implementation of industry standard and statutorily compliant security measures and safeguards. Defendant has shown itself to be incapable of protecting Plaintiffs' and Class Members' Private Information.

167. Plaintiffs and Class Members are trying to mitigate the damage that

Defendant has caused them but, given the Private Information Defendant made accessible to hackers, they are certain to incur additional damages. Because identity thieves have their Private Information, Plaintiffs and all Class Members will need to have identity theft monitoring protection for the rest of their lives.

168. None of this should have happened. The Data Breach was preventable.

***Diminution of Value of Private Information***

169. Private Information is valuable property.[72] Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information has considerable market value.

170. The Private Information stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach is difficult, if not impossible, to change.

171. This kind of data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[73]

---

[72] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[73] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

172. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[74]

173. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[75] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[76,77]

174. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[78]

175. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

176. The fraudulent activity resulting from the Data Breach may not come

---

[74] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[75] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last accessed September 5, 2024).

[76] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[77] https://datacoup.com/.

[78] https://digitalpanel.nielsen.com/ui/US/en/sdp/landing?SourceId=698&PID=join%20the,software%20installed%20on%20your%20computer

to light for years.

177. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

178. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to millions of individuals' detailed Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

179. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

***The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

180. Given the type of targeted attack in this case, the sophisticated criminal activity, the volume of data compromised in this Data Breach, and the sensitive type of Private Information involved in this Data Breach, it is probable that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

181. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are

typically discovered only when an individual's authentic tax return is rejected.

182. Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

183. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft resulting from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear, but for Defendant's failure to safeguard their Private Information.

## PLAINTIFFS' INDIVIDUAL EXPERIENCES AND INJURIES

***Plaintiff Jennifer Collier Experience and Injuries***

184. Plaintiff Jennifer Collier provided her PII to Defendant in the course of obtaining employment services from Defendant.

185. Plaintiff Collier was required to provide her PII to Defendant, including her name, date of birth, Social Security number, financial information, and other sensitive information.

186. Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff Collier's PII in its system.

187. Plaintiff Collier is very careful about sharing her sensitive PII. Plaintiff Collier stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

188. As a result of the Data Breach, Plaintiff Collier made reasonable efforts to respond to and mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, sorting through spam

emails daily, and reviewing her credit report and financial accounts for instances of misuse. Plaintiff Collier has spent significant time dealing with the Data Breach—valuable time Plaintiff Collier otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

189. Plaintiff Collier suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

190. Plaintiff Collier additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of her PII was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

191. Criminals often target data breach victims with spam emails, calls, and

texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

192. The Data Breach has caused Plaintiff Collier to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

193. As a result of the Data Breach, Plaintiff Collier anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

194. As a result of the Data Breach, Plaintiff Collier is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

195. Plaintiff Collier has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches. Plaintiff Collier alleges that Defendant has failed to implement multi-factor authentication, limit access to sensitive PII to only necessary individuals, and require the encryption of data at rest and in transit.

***Plaintiff Dana Goodson Experience and Injuries***

196. Plaintiff Goodson provided his PII to Defendant in the course of obtaining employment services from Defendant.

197. Plaintiff Goodson was required to provide his PII to Defendant, including his name, date of birth, Social Security number, financial information, and other sensitive information.

198. Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff Goodson's PII in its system.

199. Plaintiff Goodson is very careful about sharing his sensitive PII. Plaintiff Goodson stores any documents containing his PII in a safe and secure

location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Goodson would not have entrusted his PII to Defendant had he known of Defendant's lax data security policies.

200. As a result of the Data Breach, Plaintiff Goodson made reasonable efforts to respond to and mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, sorting through spam emails daily, and reviewing his credit report and financial accounts for instances of misuse. Plaintiff Goodson has spent significant time dealing with the Data Breach—valuable time Plaintiff Goodson otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

201. Plaintiff Goodson suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

202. Plaintiff Goodson additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of his PII was

caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

203. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

204. The Data Breach has caused Plaintiff Goodson to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

205. As a result of the Data Breach, Plaintiff Goodson anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

206. As a result of the Data Breach, Plaintiff Goodson is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

207. Plaintiff Goodson has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches. Plaintiff Goodson alleges that Defendant has failed to implement multi-factor authentication, limit access to sensitive PII to only necessary individuals, and require the encryption of data at rest and in transit.

***Plaintiff Joshua Wood Experience and Injuries***

208. Plaintiff Wood provided his PII to Defendant in the course of obtaining employment services from Defendant.

209. Plaintiff Wood was required to provide his PII to Defendant, including

his name, date of birth, Social Security number, financial information, and other sensitive information.

210. Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff Wood's PII in its system.

211. Plaintiff Wood is very careful about sharing his sensitive PII. Plaintiff Wood stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Wood would not have entrusted his PII to Defendant had he known of Defendant's lax data security policies.

212. As a result of the Data Breach, Plaintiff Wood made reasonable efforts to respond to and mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, sorting through spam emails daily, and reviewing his credit report and financial accounts for instances of misuse. Plaintiff Wood has spent significant time dealing with the Data Breach—valuable time Plaintiff Wood otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

213. Plaintiff Wood suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession

and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

214. Plaintiff Wood additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of his PII was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

215. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

216. The Data Breach has caused Plaintiff Wood to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

217. As a result of the Data Breach, Plaintiff Wood anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

218. As a result of the Data Breach, Plaintiff Wood is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

219. Plaintiff Wood has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches. Plaintiff Wood alleges that Defendant has failed to implement multi-factor authentication, limit access to sensitive PII to only necessary individuals, and require the encryption of data at rest

and in transit.

***Plaintiff Amber Jenkins Experience and Injuries***

220. Plaintiff Jenkins provided her PII to Defendant in the course of accepting employment with Defendant. Plaintiff was employed by Defendant from approximately October 2024 to approximately October 2025.

221. Plaintiff Jenkins was required to provide her PII to Defendant, including her name, date of birth, Social Security number, and payment card information.

222. Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff Jenkins' PII in its system.

223. Plaintiff Jenkins is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Jenkins would not have entrusted her PII to Defendant had she known of Defendant's inadequate data security policies.

224. In January or February 2026—before Plaintiff Jenkins even received notice of the Data Breach—Plaintiff Jenkins experienced unauthorized fraudulent charges on her debit card associated with her Chime bank account. Plaintiff Jenkins was required to take numerous steps to secure her bank account, including contacting Chime, disputing the fraudulent charges, and monitoring her account for further unauthorized activity. These efforts required significant time and effort.

225. Upon information and belief, the unauthorized charges on Plaintiff's account were caused by the compromise of her PII in the Data Breach. The timeline supports this inference: the unauthorized access to Defendant's employee email account occurred between July and August 2025; Plaintiff's PII — including her name, date of birth, Social Security number, and payment card information — was

stored in or accessible through that compromised account; and the unauthorized charges occurred within months thereafter, before Defendant had even notified affected individuals. Plaintiff had not experienced similar unauthorized activity prior to the Data Breach.

226. As a result of the Data Breach, Plaintiff made reasonable efforts to respond to and mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing her credit report and financial accounts for instances of misuse, and securing her bank account. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities. This time has been lost forever and cannot be recaptured.

227. Plaintiff Jenkins suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (a) unauthorized fraudulent charges on her debit card; (b) invasion of privacy; (c) theft of her PII; (d) lost or diminished value of PII; (e) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (f) loss of benefit of the bargain; (g) the continued and certainly increased risk to her PII, which remains unencrypted and available for unauthorized third parties to access and abuse and remains backed up in Defendant's possession subject to further unauthorized disclosures; (h) anxiety, stress, and fear regarding the security of her personal and financial information; and (i) the need for ongoing monitoring of her financial accounts and credit reports.

228. Plaintiff Jenkins has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

229. Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

230. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All United States residents who were sent a Breach Notice by Defendant notifying them that their PII was actually or potentially accessed during the Data Breach.

231. Plaintiffs Collier and Goodson also seeks to represent a California Subclass defined as follows:

> All California residents who were sent a Breach Notice by Defendant notifying them that their PII was actually or potentially accessed during the Data Breach.

232. Plaintiff Jenkins also seeks to represent an Illinois Subclass defined as follows:

> All Illinois residents who were sent a Breach Notice by Defendant notifying them that their PII was actually or potentially accessed during the Data Breach.

233. The Nationwide Class and the Subclasses are collectively referred to herein as the "Class."

234. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

235. Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

236. Numerosity, Fed. R. Civ. P. 23(a)(1): Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are at least multiple thousands of individuals who were notified by Defendant of the Data Breach. Tens of thousands of individuals had their Private Information compromised in this Data Breach. The identities of Class Members are ascertainable through Defendant's records, Class Members' records, publication notice, self-identification, and other means.

237. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendant had duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

d. Whether Defendant failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

e. Whether and when Defendant actually learned of the Data Breach;

f. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been

compromised;

h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

k. Whether Defendant violated the consumer protection statutes invoked herein;

l. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

m. Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

n. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

238. Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Data Breach, due to Defendant's misfeasance.

239. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class

Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

240. Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

241. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

242. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient

and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

243. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

244. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

245. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

246. Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

247. Likewise, particular issues under Rule 23(c)(4) are appropriate for

certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

e. Whether Defendant breached the implied contract;

f. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

i. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's

wrongful conduct.

## CAUSES OF ACTION

### COUNT ONE
### NEGLIGENCE
### (On behalf of Plaintiffs and the Class)

248. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

249. Defendant solicited, gathered, and stored the Private Information of Plaintiffs and the Class as part of the operation of its business and in order to gain profit.

250. All Plaintiffs and the Class Members entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their Private Information for employment/business purposes only, and/or not disclose their Private Information to unauthorized third parties.

251. Upon accepting and storing the Private Information of Plaintiffs and Class Members, Defendant undertook and owed a duty to Plaintiffs and Class members to exercise reasonable care to secure and safeguard that information and to use secure methods to do so.

252. Defendant had full knowledge of the sensitivity of the Private Information, the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully disclosed, and the importance of adequate security.

253. Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices on the part of Defendant. Plaintiffs and the Class Members had no ability to protect their Private Information that was in Defendant's possession. As such, a special relationship existed between Defendant

and Plaintiffs and the Class.

254. Defendant was well aware of the fact that cyber criminals routinely target large corporations through cyberattacks in an attempt to steal sensitive personal information, through industry knowledge and the fact that the Data Breach was not their first cybersecurity incident.

255. Defendant owed Plaintiffs and the Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when obtaining, storing, using, and managing personal information, including taking action to reasonably safeguard such data and providing notification to Plaintiffs and the Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

256. Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures also have recognized the existence of a specific duty to reasonably safeguard personal information.

257. Defendant had duties to protect and safeguard the Private Information of Plaintiffs and the Class from being vulnerable to cyberattacks by taking common-sense precautions when dealing with sensitive Private Information. Additional duties that Defendant owed Plaintiffs and the Class include:

a. To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing Defendant's networks, systems, email accounts, protocols, policies, procedures and practices to ensure that Plaintiffs' and Class members' Private

Information was adequately secured from impermissible release, disclosure, and publication;

b. To protect Plaintiffs' and Class members' Private Information in its possession by using reasonable and adequate security procedures and systems;

c. To implement processes to quickly detect a data breach, security incident, or intrusion involving its business email system, networks and servers; and

d. To promptly notify Plaintiffs and Class members of any data breach, security incident, or intrusion that affected or may have affected their Private Information.

258. Only Defendant was in a position to ensure that its systems and protocols were sufficient to protect the Private Information that Plaintiffs and the Class had entrusted to it.

259. Defendant breached its duty of care by failing to adequately protect Plaintiffs' and Class Members' Private Information. Defendant breached its duties by, among other things:

a. Failing to exercise reasonable care in obtaining, retaining securing, safeguarding, deleting, and protecting the Private Information in its possession;

b. Failing to protect the Private Information in its possession by using reasonable and adequate security procedures and systems;

c. Failing to adequately and properly audit, test, and train its employees to avoid phishing emails;

d. Failing to use adequate email security systems, including

industry standard SPAM filters, DMARC enforcement, and/or Sender Policy Framework enforcement to protect against phishing emails;

e. Failing to adequately and properly audit, test, and train its employees regarding how to properly and securely transmit and store Private Information;

f. Failing to adequately train its employees to not store Private Information longer than absolutely necessary for the specific purpose that it was sent or received;

g. Failing to consistently enforce security policies aimed at protecting Plaintiffs' and the Class's Private Information;

h. Failing to implement processes to quickly detect data breaches, security incidents, or intrusions;

i. Failing to promptly notify Plaintiffs and Class members of the Data Breach that affected their Private Information.

260. Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

261. As a proximate and foreseeable result of Defendant's grossly negligent conduct, Plaintiffs and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

262. Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the Private Information of Plaintiffs and Class Members from being stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the Private Information of Plaintiffs and Class members while it was within Defendant's possession and control.

263. Further, through its failure to provide timely and clear notification of the Data Breach to Plaintiffs and Class members, Defendant prevented Plaintiffs and Class Members from taking meaningful, proactive steps toward securing their Private Information and mitigating damages.

264. As a result of the Data Breach, Plaintiffs and Class members have spent time, effort, and money to mitigate the actual and potential impact of the Data Breach on their lives, including but not limited to, responding to fraudulent activity, closely monitoring bank account activity, and examining credit reports and statements sent from providers and their insurance companies.

265. Defendant's wrongful actions, inactions, and omissions constituted (and continue to constitute) common law negligence.

266. The damages Plaintiffs and the Class have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

267. In addition to its duties under common law, Defendant had additional duties imposed by statute and regulations, including the duties under the FTC Act, the GLBA and Regulation S-P. The harms which occurred as a result of Defendant's failure to observe these duties, including the loss of privacy, lost time and expense, and significant risk of identity theft are the types of harm that these statutes and regulations intended to prevent.

268. Defendant violated these statutes when it engaged in the actions and omissions alleged herein, and Plaintiffs' and Class Members' injuries were a direct and proximate result of Defendant's violations of these statutes. Plaintiffs therefore are entitled to the evidentiary presumptions for negligence *per se*.

269. Pursuant to the FTC Act, 15 U.S.C. § 45(a), Defendant owed a duty to Plaintiffs and the Class to provide fair and adequate computer systems and data

security to safeguard the Private Information of Plaintiffs and the Class.

270. The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also formed part of the basis of Defendant's duty in this regard.

271. Defendant gathered and stored the Private Information of Plaintiffs and the Class as part of its business, which affect commerce.

272. Defendant violated the FTC Act by failing to use reasonable measures to protect the Private Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

273. Defendant breached its duties to Plaintiffs and the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard Plaintiffs' and Class members' Private Information, and by failing to provide prompt and specific notice without reasonable delay.

274. Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

275. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act, the GLBA, Regulation S-P, was intended to guard against.

276. Defendant breached its duties to Plaintiffs and the Class under these laws by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and the Class's Private Information.

277. Defendant breached its duties to Plaintiffs and the Class by unreasonably delaying and failing to provide notice of the Data Breach expeditiously and/or as soon as practicable to Plaintiffs and the Class.

278. As a direct and proximate result of Defendant's negligence, Plaintiffs

and the Class have suffered, and continue to suffer, damages arising from the Data Breach, as alleged above.

279. The injury and harm that Plaintiffs and Class members suffered (as alleged above) was the direct and proximate result of Defendant's negligence.

280. Plaintiffs and the Class have suffered injury and are entitled to actual and punitive damages in amounts to be proven at trial.

**COUNT TWO**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiffs and the Class)**

281. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

282. Plaintiffs and Class Members were required to provide Defendant with their Private Information in order to receive employment opportunities and/or services.

283. Plaintiffs and Class Members entrusted their Private Information to Defendant. In doing so, they entered into implied contracts in which Defendant agreed to comply with its statutory and common law duties to protect their Private Information and to timely notify them in the event of a Data Breach.

284. A meeting of the minds occurred when Plaintiffs and Class Members agreed to, and did, provide their Private Information to Defendant with the reasonable understanding that their Private Information would be adequately protected from foreseeable threats. This inherent understanding exists independent of any other law or contractual obligation any time that highly sensitive PII is exchanged as a condition of receiving services. It is common sense that but for this implicit and/or explicit agreement, Plaintiffs and Class Members would not have provided their Private Information to Defendant.

285. Plaintiff and Class Members received money or paid money to

Defendant or had money paid to Defendant on their behalf with the reasonable belief and expectation that Defendant would use part of the wages withheld from employees, and earnings generated from customers, to obtain adequate data security. Defendant failed to do so.

286. Based on Defendant's conduct, representations, legal obligations, and acceptance of Plaintiffs' and the Class Members' Private Information, Defendant had an implied duty to safeguard their Private Information through the use of reasonable industry standards.

287. Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

288. Defendant breached the implied contracts by failing to safeguard Plaintiffs' and Class Members' Private Information, including through industry standard technologies like encryption, and failing to provide them with timely and accurate notice of the Data Breach. Indeed, it took Defendant *weeks* to warn Plaintiffs and Class Members of their imminent risk of identity theft. Defendant also failed to notify Plaintiffs and the Class Members whether or not their driver's license numbers were compromised, leaving Plaintiffs and Class Members unsure as to the extent of the information that was compromised.

289. As a direct and proximate result of Defendant's breach of implied contract, Plaintiffs and the Class Members have suffered damages, including foreseeable consequential damages that Defendant knew about when it requested Plaintiffs' and the Class Members' Private Information.

**COUNT THREE**
**UNJUST ENRICHEMNT**
**(On behalf of Plaintiffs and the Class)**

290. Plaintiffs incorporate by reference all allegations of the preceding

paragraphs as though fully set forth herein.

291. Plaintiffs and the Class bring this claim in the alternative to all other claims and remedies at law.

292. Those Plaintiffs and Class Members who are or were contractors of Defendant conferred a monetary benefit upon Defendant in the form of their labor and services. Defendant understood this benefit. These Plaintiffs provided Defendant their labor and Private Information on the understanding that Defendant would pay the administrative costs of reasonable data privacy and security practices and procedures from the revenue Defendant derived therefrom. In exchange, these Plaintiffs should have received adequate protection and data security for such Private Information held by Defendant.

293. Those Plaintiffs and Class Members who were customers of Defendant conferred a monetary benefit upon Defendant in the form of payment for services. The money paid to Defendant was supposed to be used by Defendant, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

294. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

295. Defendant collected, maintained, and stored the Private Information of Plaintiffs and Class Members as part of its business operations and to gain profits. As such, Defendant had direct knowledge of the monetary benefits conferred upon it.

296. Defendant, by way of its affirmative actions and omissions, including its knowing violations of its express or implied contracts with the entities that collected Plaintiffs' and the Class Members' Private Information, knowingly and

deliberately enriched itself by saving the costs it reasonably and contractually should have expended on reasonable data privacy and security measures to secure Plaintiffs' and Class Members' Private Information.

297. Instead of providing a reasonable level of security, training, and protocols that would have prevented the Data Breach, as described above and as is common industry practice among companies entrusted with similar Private Information, Defendant, upon information and belief, instead consciously and opportunistically calculated to increase its own profits at the expense of Plaintiffs and Class members.

298. Defendant failed to implement—or adequately implement—data security practices, procedures, and programs to secure sensitive Private Information, including without limitation those industry standard data security practices, procedures, and programs discussed herein.

299. As a direct and proximate result of Defendant's decision to profit rather than provide adequate data security, Plaintiffs and Class Members suffered and continue to suffer actual damages, including (i) the amount of the savings and costs Defendant reasonably and contractually should have expended on data security measures to secure Plaintiffs' Private Information, (ii) time and expenses mitigating harms, (iii) diminished value of Private Information, (iv) loss of privacy, (v) harms as a result of identity theft; and (vi) an increased risk of future identity theft.

300. Defendant, upon information and belief, has therefore engaged in opportunistic and unethical conduct by profiting from conduct that it knew would create a significant and highly likely risk of substantial and certainly impending harm to Plaintiffs and the Class in direct violation of Plaintiffs' and Class Members' interests. As such, it would be inequitable, unconscionable, and unlawful to permit

Defendant to retain the benefits it derived as a consequence of its wrongful conduct.

301. Accordingly, Plaintiffs and the Class are entitled to relief in the form of restitution and disgorgement of all ill-gotten gains, which should be put into a common fund to be distributed to Plaintiffs and the Class.

**COUNT FOUR**
**VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT**
**Cal. Civ. Code §§ 1798.100, *et seq.***
**(On Behalf of Plaintiffs Collier and Goodson and the California Subclass)**

302. Plaintiffs Collier and Goodson ("Plaintiffs" for purposes of this count) repeat, reallege, and incorporate each and every allegation contained in this Consolidated Complaint as if fully set forth herein.

303. The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.150(a), creates a private cause of action for violations of the CCPA.

304. Defendant is a "business" under § 1798.140(d) in that it is a corporation organized for profit or financial benefit of its shareholders or other owners, with gross revenues in excess of $25 million.

305. Plaintiffs are covered "consumers" under § 1798.140(i) in that they are natural persons who are California residents.

306. The Private Information of Plaintiffs and the California Subclass Members at issue in this lawsuit constitutes "private information" under § 1798.150(a) and 1798.81.5, in that the Private Information Defendant collects and which was impacted by the Data Breach includes an individual's first name or first initial and the individual's last name in combination with one or more of the following data elements, with either the name or the data elements not encrypted or redacted: (i) Social Security number; (ii) Driver's license number, California identification card number, tax identification number, passport number, military

identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual; (iii) account number or credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial account; (iv) medical information; (v) health insurance information; (vi) unique biometric data generated from measurements or technical analysis of human body characteristics, such as a fingerprint, retina, or iris image, used to authenticate a specific individual.

307. Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the California Subclass Members' Private Information and that the risk of a data breach or theft was highly likely. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the Private Information of Plaintiffs and the California Subclass Members. Specifically, Defendant subjected Plaintiffs and the California Subclass Members' nonencrypted and nonredacted Private Information to an unauthorized access and exfiltration, theft, or disclosure as a result of Defendant's violations of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, as described herein.

308. As a direct and proximate result of Defendant's violation of its duties, the unauthorized access and exfiltration, theft, or disclosure of Plaintiffs' and California Subclass Members' Private Information included exfiltration, theft, or disclosure through Defendant's servers, systems, and website, and/or the Dark Web, where hackers further disclosed the personal identifying information alleged herein.

309. As a direct and proximate result of Defendant's acts and/or omissions, Plaintiffs and the California Subclass Members were injured and lost money or

property, including but not limited to the loss of Plaintiff Plaintiffs and California Subclass Members' legally protected interest in the confidentiality and privacy of their Private Information, stress, fear, and anxiety, nominal damages, and additional losses described above.

310. Section 1798.150(b) specifically provides that "[n]o [prefiling] notice shall be required prior to an individual consumer initiating an action solely for actual pecuniary damages."

311. Plaintiffs and Subclass Members seek injunctive or other equitable relief to ensure Defendant hereinafter adequately safeguards Private Information by implementing reasonable security procedures and practices. Such relief is particularly important because Defendant continues to hold Private Information, including Plaintiffs' and California Subclass Members' Private Information. Plaintiffs and California Subclass Members have an interest in ensuring that their Private Information is reasonably protected, and Defendant has demonstrated a pattern of failing to adequately safeguard this information.

312. On March 30, 2026, Plaintiff Collier mailed a CCPA notice letter to Defendant's registered service agent, detailing the specific provisions of the CCPA that Defendant has violated and continues to violate.

313. On April 1, 2026, Plaintiff Goodson mailed a CCPA notice letter to Defendant's registered service agent, detailing the specific provisions of the CCPA that Defendant has violated and continues to violate.

314. Defendant did not cure its CPPA violations within 30 days of receipt of Plaintiff Goodson's letter; accordingly, Plaintiffs seek all actual and statutory damages permitted by the CCPA.

315. As alleged herein, an actual controversy has arisen and now exists as to whether Defendant implemented and maintained reasonable security procedures

and practices appropriate to the nature of the information so as to protect the personal information under the CCPA.

316. A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendant.

**COUNT FIVE**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW,**
**Cal. Bus. & Prof. Code §17200 *et seq.***
**(On Behalf of Plaintiffs Collier and Goodson and the Class)**

317. Plaintiffs Collier and Goodson ("Plaintiffs" for purposes of this count) repeat, reallege, and incorporate each and every allegation contained in this Consolidated Complaint as if fully set forth herein.

318. Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

319. Defendant violated Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

320. Defendant's "unfair" acts and practices include:

a. failing to implement and maintain reasonable security measures to protect Plaintiffs' and California Subclass Members' personal information from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Defendant Data Breach. Defendant failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following previous cybersecurity incidents and known coding vulnerabilities in the industry;

b. Defendant's failure to implement and maintain reasonable security measures also was contrary to legislatively declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected

in laws, including the FTC Act (15 U.S.C. § 45), California's Customer Records Act (Cal. Civ. Code § 1798.80 *et seq.*), and California's Consumer Privacy Act (Cal. Civ. Code § 1798.150);

c. Defendant's failure to implement and maintain reasonable security measures also led to substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not know of Defendant's inadequate security, consumers could not have reasonably avoided the harms that Defendant caused; and

d. Engaging in unlawful business practices by violating Cal. Civ. Code § 1798.82.

321. Defendant has engaged in "unlawful" business practices by violating multiple laws, including the FTC Act, 15 U.S.C. § 45, and California common law.

322. Defendant's unlawful, unfair, and deceptive acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class Members' personal information, which was a direct and proximate cause of the Defendant Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, which was a direct and proximate cause of the Defendant Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and California Subclass Members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Defendant Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs' and California Subclass Members' personal information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and California Subclass Members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiffs' and California Subclass Members' personal information; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and California Subclass Members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

323. Defendant's representations and omissions were material because they were likely to deceive reasonable individuals about the adequacy of Defendant's data security and ability to protect the confidentiality of their Private Information.

324. As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiffs and Class Members were injured and lost money or property, which would not have occurred but for the unfair and deceptive acts, practices, and omissions alleged herein, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, and loss of value of their Private Information.

325. Plaintiffs would not have made payments to Defendant or would have

made lesser payments had they known that Defendant's data security practices were substandard.

326. Defendant's violations were, and are, willful, unfair, unlawful, and unconscionable.

327. Plaintiffs and Class Members have lost money and property as a result of Defendant's conduct in violation of the UCL, as stated herein and above. Plaintiffs and Class Members paid Defendant money in exchange for goods or services and paid more than they would have based upon the belief that Defendant would implement reasonable data security practices and Plaintiffs and Class Members suffered from the lost benefit of their bargain with Defendant.

328. By deceptively storing, collecting, and disclosing their Private Information, Defendant took money or property from Plaintiffs and California Subclass Members.

329. Defendant acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiffs' and California Subclass Members' rights.

330. Plaintiffs and Class Members seek all monetary and nonmonetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices or use of their Private Information; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief, including public injunctive relief.

## COUNT SIX
## VIOLATION OF THE ILLINOIS PERSONAL INFORMATION AND PROTECTION ACT
## 815 ILCS § 530/1, ET SEQ.
## (On Behalf of Plaintiff Jenkins and the Illinois Subclass)

331. Plaintiff Jenkins repeats, realleges, and incorporates each and every allegation contained in this Consolidated Complaint as if fully set forth herein.

332. Defendant's conduct as alleged herein was in the conduct of "trade" or "commerce" as defined by 815 ILCS § 505/1(f).

a. Defendant's deceptive, unfair and unlawful trade acts or practices, in violation of 815 ILCS § 505/2, include:

b. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Jenkins and Illinois Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

c. Failing to identify foreseeable security and privacy risks and remediate identified security and privacy risks, with each failure being a direct and proximate cause of the Data Breach;

d. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Jenkins and the Illinois Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/2(a), and the Illinois Personal Information and Protection Act, 815 ILCS § 530/10(a), which was a direct and proximate cause of the Data Breach;

e. Omitting, suppressing and concealing the material fact that they did not reasonably or adequately secure Plaintiff Jenkins and Illinois Subclass Members' PII; and

f. Omitting, suppressing and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Jenkins and Illinois Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. §

45, the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/2(a), and the Illinois Personal Information and Protection Act, 815 ILCS § 530/10(a), which was a direct and proximate cause of the Data Breach.

333. Defendant's representations and omissions were material because they were likely to deceive reasonable persons about the adequacy of Defendant's data security and ability to protect the confidentiality of persons' PII.

334. Defendant intended to mislead Plaintiff Jenkins and Illinois Subclass Members and induce them to rely on their misrepresentations and omissions.

335. The above unfair and deceptive practices and acts by Defendant were immoral, unethical, oppressive and unscrupulous. These acts caused substantial injury to Plaintiff Jenkins and Illinois Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to competition.

336. Defendant acted intentionally, knowingly and maliciously to violate Illinois' Consumer Fraud and Deceptive Business Practices Act and recklessly disregarded Plaintiffs and Illinois Subclass Members' rights.

337. By failing to disclose the Data Breach in the most expedient time possible and without unreasonable delay, Defendant also violated 815 ILCS § 530/10(a).

338. Pursuant to 815 ILCS § 530/20, a violation of 815 ILCS § 530/10(a) constitutes an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act.

339. As a direct and proximate result of Defendant's unfair, unlawful and deceptive practices and acts, Plaintiff Jenkins and Illinois Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property and monetary and non-monetary damages, including from fraud and identity theft;

an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

340. Plaintiff Jenkins and Illinois Subclass Members seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, injunctive relief and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against Defendant as follows:

a. An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

b. A judgment in favor of Plaintiffs and the Class awarding them appropriate monetary relief, including actual damages, statutory damages, restitution, attorney fees, expenses, costs, and such other and further relief as is just and proper;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class and the general public as requested herein, including, but not limited to:

i. Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

ii. Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

iii. Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

iv. Ordering that Defendant segment customer data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

v. Ordering that Defendant cease transmitting Private Information via unencrypted email;

vi. Ordering that Defendant cease storing Private Information in email accounts;

vii. Ordering that Defendant purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

viii. Ordering that Defendant conduct regular database scanning and securing checks;

ix. Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

x. Ordering Defendant to meaningfully educate its current, former, and prospective employees and subcontractors about the threats faced as a result of the loss of financial

and Private Information to third parties, as well as the steps they must take to protect against such occurrences;

d. An order requiring Defendant to pay the costs involved in notifying the Class members about the judgment and administering the claims process;

e. A judgment in favor of Plaintiffs and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law; and

f. An award of such other and further relief as this Court may deem just and proper

**JURY DEMAND**

Plaintiffs hereby demand that this matter be tried before a jury on all issues so triable.

Dated: July 16, 2026

Respectfully Submitted,

*/s/ John J. Nelson*
John J. Nelson (SBN 317598)
**MILBERG PLLC**
280 S. Beverly Drive, Penthouse
Beverly Hills, CA 90212
Telephone: (858) 209-6941
Email: jnelson@milberg.com

*Attorney for Plaintiffs and the Putative Class*